## Commonwealth v. Huber

*Therman P. Britt,* for Commonwealth.

*Wisler, Pearlstine & Talone,* for defendant.

GROSHENS, J., March 21, 1958. — Defendant was indicted on bill no. 440, June sessions, 1957, on the charge of accessory before the fact to robbery, and on bill no. 441-1 on the charge of accessory after the fact to robbery.

At the trial before the Hon. Harold G. Knight, sitting without a jury, defendant was found guilty of accessory before the fact.

Defendant's motions for a new trial and in arrest of judgment are now before the court for disposition. In support of his motions, defendant contends in his brief: (a) That the Commonwealth failed to prove his guilt beyond a reasonable doubt, and (b) that defendant withdrew from any plan or scheme of robbery

so as to make him not guilty as an accessory before the fact.

We have carefully examined the notes of testimony in their entirety and the transcript of oral arguments at the trial. We are convinced there was ample evidence to support President Judge Knight's verdict of guilty on the charge of accessory before the fact.

The happening of the robbery was not in dispute at the trial, as counsel for defendant admitted in open court that a robbery had taken place. The issue was narrowed down to defendant's connection with the robbery.

To prove defendant's implications the Commonwealth called the two police officers who investigated the case and one of the principals to the robbery. Both police officers testified defendant freely admitted to them three days after the robbery that he had furnished the rifle used in the robbery and the naptha type fluid used on the victim, that he knew a "hold-up" was planned, that he had been asked to accompany the principals which he refused to do, that defendant had gone to the police station on the night of the robbery where he learned that the robbery had taken place and that he went forthwith to the home of one of the principals to get his rifle back.

One of the three principals, Ernest Farr, testified that defendant knew of the plan and that defendant furnished the rifle and naptha (ether).

Defendant took the stand in his own defense and corroborated much of the Commonwealth's evidence. For example defendant testified concerning his rifle and his knowledge of its proposed use in a conversation with John Goodwin, one of the principals:

" 'Sure, you can borrow it,', and I asked him what he was going to do with it, and he said:

" 'I am going to rob somebody.' "

By the Court:

"Q. Going to what?

"A. He said he was going to rob somebody.

"Q. Rob somebody?

"A. That's it."

By Mr. Pearlstine:

"Q. And then what did you say to him about that?

"A. I just laughed right then, and then Landis, Dave Landis came in and I hadn't had a chance to talk to him again till we got down to my place.

"Q. Did Goodwin at that time say anything about you going with him or where they were going or anything like that or what they planned to?

"A. Yes, at that time he asked me to go along.

"Q. What did you say?

"A. I said no I had a date at first; and then he was persistent and it seemed like he wanted me to go and I says: *'No, I ain't going to get involved in anything like that'* (Italics supplied)

"Q. Did you or not think he was serious at the time?

"A. No, I did not."

An accessory before the fact is defined in Commonwealth v. Habecker, 113 Pa. Superior Ct. 335, at page 340, as:

". . . one who plans, cooperates, assists, aids, counsels or abets in the perpetration of a felony."

Certainly, the Commonwealth's evidence of aid given by this defendant, supported as it is by defendant's own testimony, amply supports the finding of guilt. The defense of withdrawal remains but to be considered.

The aid given by defendant to the principals in the perpetration of the robbery was supplying the rifle and the naptha type fluid which were indubitably used by the principals. To "aid" literally means to "help". A rifle, for instance, may be of great help to a robber. A pointed rifle is one of the oldest and most effective

methods to cow a person into the quick and docile relinquishment of his wallet. Hence, a person who supplies an avowed robber with a rifle which is shortly thereafter used by the robber in a robbery may be said to have aided the robber.

The fact that this defendant was asked to participate in the robbery as a principal, and that he refused, does not constitute such a withdrawal as would relieve him of criminal liability as an accessory before the fact. Had this defendant demanded and received back his rifle, or had he reported the principals to the police in time to thwart the robbery, then he could be said to have withdrawn successfully. Having placed the rifle in the hands of John Goodwin who, according to defendant's own testimony, told defendant "he was going to rob somebody", defendant committed himself to a sequence of events from which he could only extricate himself by getting his rifle out of the hands of John Goodwin before the robbery, or by thwarting the robbery in some other way. The "aid" in this case was the rifle. Therefore, to effectively withdraw made it incumbent upon defendant to get the rifle out of the hands of John Goodwin, or the equivalent thereof. He did neither of these things. He did, however, go to the police station where he learned of the perpetration of the robbery. He then rushed posthaste to get his rifle, not to withdraw from the crime, but to get incriminating evidence out of the possession of a principal who was then the object of a police investigation.

The credibility of defendant was for the trial judge, who saw him on the stand and who heard him testify, when defendant told Judge Knight that he did not take seriously John Goodwin's declared intention to rob someone with the rifle, Judge Knight obviously did not believe him. Upon a close scrutiny of the testimony, many circumstances appear which justify Judge

Knight's disbelief. For example, why did defendant say:

"I ain't going to get involved in anything like that", when John Goodwin importuned him to actually participate in the robbery. Certainly, at that time, defendant knew John Goodwin was serious. Nevertheless defendant immediately thereafter drove John Goodwin to defendant's home where he got his rifle and handed it to John Goodwin.

Was it a mere coincidence that defendant happened to be in the police station when he overheard an officer report a robbery? Why was defendant so certain his rifle had been used in the robbery that he rushed to the home of John Goodwin to get his rifle? The actions of defendant, as well as his verbal admissions, indicated a consciousness of his own marginal involvement in the robbery. Defendant's conduct before and after the robbery was inconsistent with innocence. His long and friendly association with John Goodwin, who is conceded to be one of the principal felons, is a circumstance which, together with the other proof submitted, was sufficient to sustain the verdict of guilty.

At argument it was suggested that Judge Knight's retirement since the trial makes a new trial necessary because no member of the present court is qualified to impose sentence. With this suggestion we cannot agree.

"In no event should a substitution or replacement after verdict ever be permitted except under unavoidable circumstances, such as sickness, impossibility to act, or other substantial cause which would make the continuance of the trial judge's presence impossible": Commonwealth v. Thompson, 328 Pa. 27, 31.

The expiration of Judge Knight's term of office on January 6, 1958, is a "substantial cause" which justifies the substitution of another judge to impose sentence.

And now, March 21, 1958, defendant's motions for a new trial and in arrest of judgment are dismissed, and defendant is ordered to appear for sentence at miscellaneous court on Friday, March 28, 1958.